CASE NO. 25-5396

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

DR. AMY DICHIARA

*Plaintiff-Appellant*

v.

SUMMIT MEDICAL GROUP, INC., DBA ST. ELIZABETH PHYSICIANS;
ST. ELIZABETH MEDICAL CENTER, INC., DBA ST. ELIZABETH
HEALTHCARE; DR. ROBERT PRICHARD; AND GARREN COLVIN

*Defendants-Appellees*

On Appeal from the United States District Court
for the Eastern District of Kentucky
Case No. 2:22-cv-00111

---

## BRIEF OF DEFENDANTS-APPELLEES

---

Respectfully submitted,

/s/ Mark D. Guilfoyle
Mark D. Guilfoyle (KBA #27625)
Nicholas C. Birkenhauer (KBA #91901)
Michael J. Enzweiler (KBA #96989)
DRESSMAN BENZINGER LAVELLE PSC
109 East Fourt Street
Covington, Kentucky 41011
(859) 341-1881
mguilfoyle@dbllaw.com
nbirkenhauer@dbllaw.com
menzweiler@dbllaw.com
*Counsel for Defendants-Appellees*

## CORPORATE DISCLOSURE

Pursuant to Fed. R. App. P. 26.1 and 6th Cir. R. 26.1, Defendants-Appellees (collectively, "Defendants") hereby make the following disclosures.

Summit Medical Group, Inc. d/b/a St. Elizabeth Physicians ("SEP") is a Kentucky nonprofit corporation that employs physicians like the formerly-employed Plaintiff-Appellant, Dr. Amy DiChiara ("DiChiara"). SEP is not a subsidiary or affiliate of a publicly owned corporation, and there is no parent corporation or publicly held corporation that owns 10% or more of SEP's stock.

Saint Elizabeth Medical Center, Inc. d/b/a St. Elizabeth Healthcare (referred to herein as "St. Elizabeth," but referred to by DiChiara as "SEH") is a Kentucky nonprofit corporation that operates hospitals. St. Elizabeth is not a subsidiary or affiliate of a publicly owned corporation, and there is no parent corporation or publicly held corporation that owns 10% or more of St. Elizabeth's stock.

Dr. Robert Prichard ("Prichard") is an individual and the retired Chief Executive Officer of SEP. Prichard is not a subsidiary or affiliate of a publicly owned corporation.

Garren Colvin ("Colvin") is an individual and current Chief Executive Officer of St. Elizabeth. Colvin is not a subsidiary or affiliate of a publicly owned corporation.

# **TABLE OF CONTENTS**

CORPORATE DISCLOSURES…………………………………………………...     i

TABLE OF CONTENTS…………………………………………………….     ii

TABLE OF AUTHORITIES……………………………………………     v

STATEMENT REGARDING ORAL ARGUMENT…………………………     viii

STATEMENT OF ISSUES…………………………………………………...     ix

COUNTERSTATEMENT OF THE CASE………..…………………………..     1

I.      DiChiara voices "medical and scientific concerns" about the COVID-19 vaccination policy……………………………………………………     1

II.     The policy is challenged in *Beckerich I*, but not under Title VII/the ADA……………………………………………………………………...     2

III.    The policy is again challenged in *Beckerich II*, which lawsuit includes the private emails DiChiara exchanged with Prichard and Colvin……...     3

IV.     DiChiara apologizes and represents she never intended to participate in litigation and never approved use of the emails for litigation……….     5

V.      Counsel represents DiChiara "declined" to participate in *Beckerich II* and would "vigorously fight" any attempt to have her assist with it…...     7

VI.     While DiChiara's request for a religious exemption is pending, her counsel threatens a Title VII retaliation claim if she is terminated……..     8

VII.    DiChiara is terminated for breaching her Employment Agreement……     10

VIII.   DiChiara claims retaliation but loses at summary judgment…………...     10

SUMMARY OF THE ARGUMENT………………………………………     11

STANDARD OF REVIEW……………………………………………………...     13

ARGUMENT……………………………………………………………… 13

I.    Defendants were entitled to judgment on Title VII/ADA Retaliation…. 14

    A.    The District Court correctly ruled on protected activity………. 14

        1.    The District Court correctly determined DiChiara's conduct "clearly" did not trigger the participation clause. 14

        2.    The Court can also reject participation-clause protection on the grounds that no EEOC charge was pending……... 18

        3.    The District Court correctly held that any putative opposition was unreasonable and thus not protected…… 19

        4.    The Court can also affirm for lack of an opposition…….. 22

    B.    The District Court correctly ruled on notice…………..………. 23

        1.    DiChiara's language, in context, did not provide notice... 25

        2.    SEP did not admit notice of protected activity………….. 25

        3.    The Termination Letter does not establish notice…....… 29

        4.    DiChiara's request for a "negative inference" is baseless. 30

    C.    The Court can affirm summary judgment for lack of causation too…………………………………………………………….... 31

    D.    The Court can also affirm for lack of pretext…....………..………. 32

    E.    The claim for Title VII/ADA Retaliation also does not apply to St. Elizabeth…....……..……………………………………….... 33

        1.    St. Elizabeth was not DiChiara's "joint employer." 34

        2.    St. Elizabeth and SEP are not an "integrated enterprise." 35

3. St. Elizabeth did not interfere with her employment either……………………………………………… 37

II. Defendants were entitled to summary judgment on KCRA Retaliation. 38

III. Defendants were entitled to judgment on Discharge Against Public Policy…………………………………………………………. 39

A. The District Court correctly found this claim should not be "expanded" beyond at-will employment…………………… 39

B. The Court can also affirm summary judgment on the merits….. 41

IV. Defendants were entitled to summary judgment on Breach of Contract. 42

V. Defendants were entitled to judgment on Tortious Interference………. 45

VI. Defendants were entitled to judgment on the claim for declaratory relief……………………………………………………... 46

CONCLUSION…………………………………………………. 46

CERTIFICATE OF COMPLIANCE…………………………………… 48

CERTIFICATE OF SERVICE………………………………………... 48

ADDENDUM – DESIGNATION OF REFERENCED DOCUMENTS........... 49

## <u>TABLE OF AUTHORITIES</u>

<u>Cases</u>

*Aldrich v. Rural Health Servs. Consortium, Inc.*
579 F. App'x 335 (6th Cir. 2014)……………………………………………...    15

*Armbruster v. Quinn*
711 F.2d 1332 (6th Cir. 1983)……..………………….....................................    36

*Barnard v. Powell Valley Elec. Coop.*
2022 WL 1261831 (6th Cir. Apr. 28, 2022)…………...………………….    16

*Bashaw v. Majestic Care of Whitehall, LLC*
130 F.4th 54 (6th Cir. 2025)…...........................................................................    32

*Booker v. Brown & Williamson Tobacco Co.*
879 F.2d 1304 (6th Cir. 1989)………………………….……........    18, 19, 22

*Choate v. Koorsen Protective Servs., Inc.*
929 S.W.2d 184 (Ky. 1996)……………………………………...……………    46

*Christopher v. Strouder Mem'l Hosp.*
936 F.2d 870 (6th Cir. 1991)……………………………………...…………...    37

*Clemans v. Nat'l Staffing Sols., Inc.*
459 F. Supp. 3d 842 (E.D. Ky. 2019)…………………………………………    46

*Cowing v. Commare*
499 S.W.3d 291 (Ky. App. 2016)……………………………...……………    38

*Crawford v. Chipotle Mexican Grill, Inc.*
773 F. App'x 822 (6th Cir. 2019)……………………………………    23, 24

*Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*                 22
555 U.S. 271 (2009)……………………………………………………….

*E.E.O.C. v. Skanska USA Bldg., Inc*.
550 Fed. Appx. 253 (6th Cir. 2013)…………………………………………...    34

*Firestone Textile Co. Div. v. Meadows*
666 S.W.2d 730 (Ky. 1983)…............................................................ 40

*Fort Bend Cnty., Texas v. Davis*
87 U.S. 541 (2019) ……………….................................................... 19

*Grzyb v. Evans*
700 S.W.2d 399 (Ky. 1985)………...…………………...................... 41

*Hamade v. Valiant Gov't Servs., LLC*
807 Fed. Appx. 546 (6th Cir. 2020)................................................... 18

*Haydar v. Amazon*
2021 WL 4206279 (6th Cir. Sept. 16, 2021)……………….………………… 24

*Haynes v. Zoological Soc. of Cincinnati*
652 N.E.2d 948 (Ohio 1995)………….…………………………………... 40

*Hill v. Ky. Lottery Corp.*
327 S.W.3d 412 (Ky. 2010)………….................................................. 41

*Johnson v. Univ. of Cincinnati*
215 F.3d 561 (6th Cir. 2000)……………………………...………….... 19

*Kirkland v. City of Maryville, Tennessee*
54 F.4th 901 (6th Cir. 2022)……………………………………………... 14

*Klepsky v. UPS, Inc.*
483 F.3d 264 (6th Cir. 2007)……………………….............................. 40

*Loyd v. Saint Joseph Mercy Oakland*
766 F.3d 580 (6th Cir. 2014)………….............................................. 33

*MacEachern v. Quicken Loans, Inc.*
2017 WL 5466656 (6th Cir. Oct. 17, 2017) ……………….................. 31

*Marshall v. Montaplast of N. Am., Inc.*
575 S.W.3d 650 (Ky. 2019)…………………………………………… 41

*Nethery v. Quality Care Investors, L.P.*
814 Fed. Appx. 97 (6th Cir. 2020)…............................................................   35, 37

*Niswander v. Cincinnati Ins. Co.*
529 F.3d 714 (6th Cir. 2008)…………………………………..   14, 15, 19, 31, 33

*Norton Hosps., Inc. v. Peyton*
381 S.W.3d 286 (Ky. 2012), ………………………………………………..   45

*Patterson v. Kent State Univ.*
2025 WL 2630307 (6th Cir. Sept. 12, 2025)…...............................................   13

*Roof v. Bel Brands, USA, Inc..*
641 Fed. Appx. 492 (6th Cir. 2016) ………….........................................   38

*Sanford v. Main Street Baptist Church Manor, Inc.*
449 Fed. Appx. 488 (6th Cir. 2011)………………………………...   35, 36, 37

*Shrout v. The TFE Grp.*
161 S.W.3d 351 (Ky. App. 2005) …………………...........................................   41

*Satterfield v. Tennessee*
295 F.3d 611 (6th Cir. 2002) …………………….............................................   36

*Smyer v. Kroger Ltd. P'ship I*
2024 WL 1007116 (6th Cir. Mar. 8, 2024)…………………………………   13

*Swallows v. Barnes & Noble Book Stores, Inc.*
128 F.3d 990 (6th Cir. 1997)………………………………...……………   35, 36

*York v. Tennessee Crushed Stone Ass'n*
684 F.2d 360 (6th Cir. 1982)………...............................................................   37

Statutes

42 U.S.C. § 2000e-3(a) …………………….....................................................   14

42 U.S.C. § 12203(a)…………………………………………………………   14

Kentucky Rule of Evidence 503…………………………………………..   41, 42

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Defendants agree this case presents important legal issues which justify oral argument. The actual facts, even when viewed in DiChiara's favor, prove she did not engage in protected activity as a matter of law—and even if she had, she did not put SEP on notice of it because she was telling SEP the opposite in real time. The issue of notice was particularly appropriate for summary judgment because every single pre-termination communication with SEP was contained in either a written email or an oral conversation DiChiara surreptitiously recorded. Thus, as recognized by the District Court, there are no issues of fact about what DiChiara represented to SEP about her activities and her motivations—and those representations were insufficient to invoke any statutory antiretaliation protection.

Ultimately, if DiChiara's arguments regarding protected activity and notice are accepted, employers who have legitimate contractual grounds to terminate for cause will be subject to liability for statutory retaliation solely because the employee was silently harboring "thoughts" and "concerns" about statutory violations the employee never mentioned and never put her employer on notice of. In fact, employers will be subject to liability even if the employee affirmatively represents, in writing, that she was not participating in a statutory proceeding or opposing allegedly unlawful employment practices. This is untenable as a matter of law.

## STATEMENT OF ISSUES

This case arises from the for-cause termination of DiChiara, who violated her Employment Agreement with SEP by disclosing private, confidential emails she exchanged with the CEO of her employer (SEP) and the CEO of the hospital system (St. Elizabeth) regarding her medical and scientific objections to a COVID-19 vaccination policy.  The issue in this appeal is whether the United States District Court for the Eastern District of Kentucky ("the District Court") correctly granted summary judgment to Defendants on the following claims:

| | |
|---|---|
| Count I: | Retaliation Under Title VII of the Civil Rights Act ("Title VII") and the Americans with Disabilities Act ("ADA") |
| Count II: | Retaliation and Conspiracy under the Kentucky Civil Rights Act ("KCRA") |
| Count IV: | Discharge Against Public Policy |
| Count V: | Breach of Contract |
| Count VI: | Tortious Interference |
| Count VII: | Declaratory Relief regarding Non-Compete Provision |

(Opinion, R. 72, Page ID# 3530-3558.[1])  The District Court's Memorandum Opinion and Order ("the Opinion") likewise denied DiChiara's motion for summary judgment on these claims.  (*Id.*)  A final judgment was entered on April 23, 2025. (Judgment, R. 73, Page ID# 3559.)

---

[1] DiChiara previously withdrew Count III (Failure to Accommodate under Title VII), presumably because her religious beliefs were, in fact, accommodated in the form of a religious exemption to vaccination.  (Order, R. 43, Page ID# 516.)

## COUNTERSTATEMENT OF THE CASE

As the District Court recognized, essentially all of the claims hinge on the nature of DiChiara's activities and what SEP knew about them when it terminated her on October 4, 2021. In order for the Court to understand the events as known to SEP in real time, the following factual statement sets forth the events as they occurred, while pointing out in the footnotes how DiChiara mischaracterizes them. The Summary of the Argument then demonstrates how DiChiara has attempted to concoct a new narrative in this litigation by contorting the known facts beyond recognition and relying heavily on putative "thoughts" and "concerns" that, even if true, were contained only within the recesses of DiChiara's mind.

## I.     DiChiara voices "medical and scientific concerns" about the COVID-19 vaccination policy.

On August 5, 2021, SEP and St. Elizabeth adopted a policy requiring all employees to either get vaccinated or obtain a religious or medical exemption by October 1, 2021. (8/5/21 Email, R. 50-2, Page ID# 2726.) On August 9, DiChiara sent an email to Prichard and Colvin stating: "[a]s a Gastroenterologist and employee of SEP, I would like to request a meeting with the both of you to discuss my concerns regarding this new COVID vaccine policy." (8/9/21 Email, R. 50-6, Page ID# 2738.)

A meeting was arranged for August 16, 2021. Shortly before the meeting, DiChiara sent Prichard and Colvin a 27-page letter which began as follows:

1

> While there are many approaches one can discuss on this matter, I wanted to focus my appeal by grounding it in scientific, medical information. This document is intended to be seen as a professional document, focused on my medical and scientific concerns as a physician.

(8/16/21 Letter, R. 50-10, Page ID# 2745.)  The letter described her medical and scientific concerns—*e.g.,* vaccines do not prevent transmission; natural immunity provided equal protection; and vaccines are unsafe.  (*Id.*, Page ID# 2746-2747.)

DiChiara then met with Prichard and Colvin for over an hour as she surreptitiously recorded. (DiChiara Dep., R. 50, Page ID# 2528:21 – 2529:4; 8/16/21 Audio Recording, R. 44-68.)  DiChiara explained her medical and scientific concerns, without mentioning any concerns about religious or disability rights or how they may be jeopardized by the handling of requests for religious or medical exemptions—which SEP was required to consider under Title VII and the ADA.

DiChiara sent follow-up emails to Prichard and Colvin on August 16 and 17, but they again related only to DiChiara's medical and scientific objections to the vaccination policy.  They did not identify any concerns about SEP possibly violating Title VII or the ADA by discriminating against employees who request religious or medical exemptions.  (8/16/21 and 8/17/21 Emails, R. 50-11, Page ID# 2772.)

## II.    The policy is challenged in *Beckerich I*, but not under Title VII/the ADA.

On August 23, a lawsuit ("*Beckerich I*") was filed by Deters Law—a firm whose namesake (Eric Deters) was no longer licensed to practice.  (*Beckerich I* Compl., R. 50-15, Page ID# 2783-2893.)  *Beckerich I* was a putative class action

with about 40 plaintiffs, but DiChiara was not one of them. *Beckerich I* asserted 20 causes of action, but none under Title VII or the ADA.[2] (*Id.*, Page ID# 2864-2891.)

On August 26, DiChiara sent follow-up emails to Colvin and Prichard without mentioning any putative concerns over the handling of exemption requests. (8/26/21 Email to Colvin, R. 50-16, Page ID# 2894; 8/26/21 Email to Prichard, R. 50-18, Page ID# 2897-2898.) On August 27, Prichard informed DiChiara that SEP did not plan to alter its policy, but it would continue to monitor new developments. (8/27/21 Email to DiChiara, R. 50-18, Page ID# 2897.)

On August 29, *Beckerich I* was voluntarily dismissed by Deters Law via a Notice of Dismissal Without Prejudice. (*Christy Beckerich, et al. v. St. Elizabeth, et al.*, Eastern District of Kentucky Case No. 2:21-cv-100-DLB-EBA, R. 13.)

## III. The policy is again challenged in *Beckerich II*, which lawsuit includes the private emails DiChiara exchanged with Prichard and Colvin.

On September 3, roughly the same group of plaintiffs (which again did not include DiChiara) filed a second lawsuit ("*Beckerich II*"). (*Beckerich II* Compl., R. 50-35, Page ID# 2951-3043.) *Beckerich II* asserted the same 20 causes of action from *Beckerich I*, plus three new claims for violations of Title VII, the ADA, and Promissory Estoppel. (*Id.*, Page ID# 3010-3041.) The filing of the *Beckerich  II*

---

[2] DiChiara claims she was aware Title VII and ADA claims were being asserted on August 23, because "the [*Beckerich I*] complaint included both claims." (DiChiara Br., p. 6.) This is just one example of mischaracterization, for it is indisputable the *Beckerich I* Complaint did not contain claims under Title VII or the ADA.

Complaint on September 3 was the first time any Title VII or ADA claims were asserted relative to the policy.[3]

Particularly surprising about *Beckerich II* was a new "Exhibit 3" consisting of the private emails DiChiara had exchanged with Prichard and Colvin regarding her medical and scientific beliefs. (Exhibit 3 to *Beckerich II*, R. 50-33, Page ID# 2938-2947.) It was apparent DiChiara had forwarded these emails to someone at Deters Law, but the identity of the recipient and the time of transmission had been redacted. (*E.g., id.*, Page ID# 2939.) It was also apparent DiChiara had appended some additional comments as she forwarded the emails, but none of those comments related to concerns about potential legal violations arising from the processing of religious or medical exemption requests. (*Id.*, Page ID# 2939 and 2941.)

Understandably then, Exhibit 3 was not cited in the *Beckerich II* Complaint as support for the new Title VII/ADA claims. Rather, Exhibit 3 was cited four times as putative support for conspiratorial fraud theories about the Government and the Defendants "lying" about the FDA approval of the COVID-19 vaccines:

- "The most recent fraud is Americans are not receiving an FDA approved vaccine (**Exhibit 3**)." (*Beckerich II* Compl., R. 50-35, Page ID# 2957.)

- "Colvin and Pritchard [*sic*] KNOW they have lied to the entire work force (**Exhibit 3**). (*Id.*, Page ID# 2958.)

---

[3] In an attempt to obfuscate the actual course of events, DiChiara's Brief does not distinguish between *Beckerich I* and *Beckerich II*, even though they were materially different lawsuits containing different legal claims.

- "The Comirnaty vaccine is the one approved and is not even in production (**Exhibit 3**).  The attached emails prove the fraud (**Exhibit 3**)."  (*Id.*, Page ID# 2959.)

- "The U.S. government and Defendants are lying about the Pfizer approval. **Exhibit 9** and **Exhibit 3**."  (*Id.*, Page ID# 2982, ¶ 142.)

These were the only citations to Exhibit 3 in the *Beckerich II* Complaint.[4]

## IV.  DiChiara apologizes and represents she never intended to participate in litigation and never approved use of the emails for litigation.

On September 5, DiChiara sent Prichard and Colvin a "Letter of Apology." (9/5/21 Apology, R. 50-36, Page ID# 3044-3047.)  The Apology acknowledged the private nature of the emails, stating she was "shocked and angered to learn that Deters Law had appended to its Complaint … copies of documents that I shared <u>confidentially</u> with Mr. Deters, including private email exchanges you and I have had[.]"  (*Id.*, Page ID# 3046; emphasis in original.)  The Apology also represented the following regarding her "facts and intent" for corresponding with Eric Deters:

> I am writing to communicate facts and intent regarding this matter.  First, please know that I did not authorize Deters Law to publicize those emails or any other documents that I had authored[.] … I certainly did not approve their use as exhibits for a Complaint in a lawsuit. …
>
> I had obviously been in private communication with [Eric] Deters … as I navigated my personal thoughts about the disturbing conflict between what seems to be, on one hand, the "mandate" position of our local healthcare systems and, on the other hand, the opinions and reservations

---

[4] DiChiara asserts the emails in Exhibit 3 were "***attached exhibits in support of the Title VII and ADA claims being made***" in *Beckerich II*.  (DiChiara Br., p. 10; emphasis in original).  This is another instance of mischaracterization, for no person could read the four references to Exhibit 3 and conclude it was cited for those claims.

of so many doctors, scientists, and valued colleagues.  It was never my intent to seek litigation against St. Elizabeth Healthcare, and I never asked Deters Law to represent me, nor did I sign any affidavits for Deters Law. Needless to say, I feel exploited by Eric Deters.  Rest assured I will have no more communications with Deters Law except through legal counsel.

Finally, I apologize to you personally[.] … I deeply regret any personal embarrassment this may have caused you. … I am thankful to and greatly respect the both of you for the time you devoted to listening to me and responding to my concerns.

(*Id.*, Page ID# 3046-3047.)

Consistent with her prior communications, the Apology alluded to her medical and scientific concerns but did not identify any legal concerns arising from exemption requests.  The plain language of the Apology also negated any notion that she had participated in (or planned to participate in) *Beckerich II*, or had assisted with (or planned to assist with) the Title VII/ADA claims asserted in *Beckerich II*.[5]

On September 8, Prichard responded he was "very disappointed and upset that you would share our private conversations and emails," and he was requesting she provide unredacted copies of her communications with Mr. Deters.  (9/8/21 Email,

---

[5] The Apology—which is the dispositive characterization of her conduct and motives (that is, unless she was misrepresenting her "facts and intent" to SEP)—is relegated to a single sentence in DiChiara's Brief.  Even worse, that one sentence is a mischaracterization. (*See* DiChiara Br., p. 11, which claims she sent the Apology because she "***feared retaliation** … **as a result of her participation in the Beckerich Title VII and ADA lawsuit**.*") This contradicts not only the Apology itself but also DiChiara's subsequent testimony that she sent the Apology because she was "concerned about my professional relationship with [Colvin] and [Prichard], and was trying to mend that[.]" (DiChiara Dep., R. 50, Page ID# 2618:1-17.)

R. 44-41, Page ID# 991.)  This was a reasonable request because Prichard needed to evaluate the scope of the unauthorized disclosure, and because DiChiara had just represented she "never asked Deters Law to represent [her]."

**V.    Counsel represents DiChiara "declined" to participate in *Beckerich II* and would "vigorously fight" any attempt to have her assist with it.**

On September 13, DiChiara's counsel objected to producing unredacted emails on the basis of privilege. (9/13/21 Email, R. 44-46, Page ID# 1001.)  More importantly, counsel represented the following about her activities:

> When it became apparent that the Deters Firm was interested in litigation against Saint Elizabeth that DiChiara did not feel comfortable pursuing, she broke off communication with the firm … and Mr. Deters[.]
>
> We understand that Eric Deters and the Deters Firm took Dr. DiChiara's attorney-client privileged documents, and submitted a couple of them in furtherance of a lawsuit brought by other clients of that firm.  DiChiara did not authorize this. …
>
> And, while Mr. Deters has sought her assistance with his suit, including attempting to have her testify, she is asserting her position that she will not do so, and has instructed [counsel] to vigorously fight any subpoena[.]

(*Id*., Page ID# 1001.)

Consistent with the Apology, counsel's email confirmed she was not participating in *Beckerich II*, for she broke off communication when she realized Deters Law was "interested in litigation" she "did not feel comfortable pursuing."  It was apparent this was a reference to *Beckerich II*, because some of the emails in Exhibit 3 postdated the August 23rd filing of the (now-dismissed) *Beckerich I*.

Counsel's email also confirmed DiChiara had not assisted with the Title VII/ADA claims asserted for the first time in *Beckerich II*. Nor would she assist with the Title VII/ADA claims moving forward, for she had instructed her counsel to "vigorously fight" any subpoena or attempt to have her assist with *Beckerich II*.

On September 15, SEP's counsel asked for authority supporting a privilege with Eric Deters (a non-lawyer), as well as for clarification on the timing of her communications. (9/15/21 Email, R. 44-49, Page ID# 1010.) DiChiara's counsel responded they were asserting privilege based on Eric Deters being a "representative of the lawyers" at Deters Law. (*Id.*, Page ID# 1009.) More importantly, counsel represented that DiChiara had explicitly "declined" to participate in *Beckerich II*:

> Admittedly, the lawsuits [*i.e., Beckerich I* and *Beckerich II*] were not filed with DiChiara as a party. When I speak of commencing litigation, I mean only that was what they wanted DiChiara to be a part of and participate in as a party, and she declined to do so.

(*Id.*) Counsel also stated—consistent with their instructions to "vigorously fight" any efforts to have DiChiara assist with *Beckerich II*—that they had demanded the retraction of a subpoena issued for DiChiara's testimony in *Beckerich II*. (*Id.*)

## VI. While DiChiara's request for a religious exemption is pending, her counsel threatens a Title VII retaliation claim if she is terminated.

As counsel exchanged emails, DiChiara submitted a religious exemption request on September 13. (9/13/21 Exemption Request, R. 50-40, Page ID# 3081-3083.) This was the first time she cited any sort of religious objection to vaccination.

8

On September 20 at 3:04 p.m., SEP's counsel renewed the request for unredacted copies of the emails in Exhibit 3. (9/20/21 Email, R. 44-53, Page ID# 1022.) At 4:12 p.m., DiChiara's counsel asked for the basis of the request, since in their view the attorney-client privilege applied.[6] (*Id*., Page ID# 1021.)

Counsel also stated at 4:12 that if DiChiara was terminated, it seemed to "raise a prima facie case of Title VII retaliation[.]" (*Id*., Page ID# 1021.) Considering her only religious-based activity was submitting an exemption request (which was still pending), SEP interpreted the phrase "Title VII retaliation" as a reference to a scenario where she was terminated for making that request. However, at 4:14 p.m., DiChiara received an email from the Director of Employee Health stating her exemption request had been granted. (9/20/21 Email, R. 50-41, Page ID# 3084.) Thus, DiChiara's religious beliefs were accommodated, and the type of "Title VII retaliation" alluded to in counsel's prior email did not materialize.[7]

---

[6] DiChiara argues SEP "repeatedly continued to demand that DiChiara waive her attorney-client privilege, and they made threats against her should she fail to do so." (DiChiara Br., p. 15.) These assertions are false, for this email on September 20 was the last communication about the possible provision of unredacted emails. The issue fizzled out without any "waive-your-asserted-privilege-or-be-fired" threat.

[7] DiChiara's citation to her counsel's September 20th email is perhaps the most egregious mischaracterization in her Brief. (*See* DiChiara Br., p. 15, where she claims the September 20th "***specifically informed***" SEP that its conduct "***constituted ADA and Title VII retaliation for DiChiara's participation in the Beckerich suit***;" emphasis in original.) The email contains no reference to the ADA at all, and counsel had already represented that DiChiara "declined" to participate in *Beckerich II*. DiChiara is trying to rewrite this email to fit her litigation narrative.

## VII.   DiChiara is terminated for breaching her Employment Agreement.

On October 4, Prichard hand-delivered a letter to DiChiara stating she was terminated for cause due to violations of her Employment Agreement, including misappropriation of SEP property; violation of policy; disruptive and unprofessional conduct; and breach of loyalty.  (10/4/21 Termination Letter, R. 50-44, Page ID# 3107-3108.)   Unbeknownst to Prichard, DiChiara surreptitiously recorded this meeting too.  (DiChiara Dep., R. 50, Page ID# 2641:12-21.)  The recording proves DiChiara again did not identify any legal concerns.  Instead, when Prichard stated that her conduct felt like a betrayal, she admitted: "I can see why you'd view it like that."  (10/4/21 Audio Recording, R. 55, at 04:56 – 5:03.)  Thus, even DiChiara's last-ditch efforts to save her job did not implicate any statutory protection.

## VIII.  DiChiara claims statutory retaliation but loses at summary judgment.

On October 8, 2021, DiChiara filed a charge with the Equal Employment Opportunity Commission.  (Am. Compl., R. 31, ¶ 63.)  She filed this lawsuit on August 29, 2022.  (Compl., R. 1, Page ID# 1-19.)  The parties ultimately filed cross-motions for summary judgment, and the District Court held oral argument on March 7, 2025.  (Argument Transcript, R. 71, Page ID# 3465-3529.)  On April 23, 2025, the District Court granted summary judgment based upon these principal holdings: (1) DiChiara had not engaged in protected activity; (2) even if she had, she failed to prove notice; and (3) SEP had four contractual bases to terminate DiChiara for cause.

## SUMMARY OF THE ARGUMENT

Because the facts known to SEP in real time defeat protected activity and notice, DiChiara's Brief recycles a false litigation narrative pieced together by mischaracterizing legal filings, rewriting emails (including ones SEP never saw), and relying on supposed "thoughts" and "concerns" about Title VII and ADA violations that DiChiara never said out loud.  The narrative goes as follows:

- During the meeting on August 16, she intentionally did not discuss exemptions, but she "thought" her scientific concerns were "relevant and important" in the evaluation of exemption requests.  (DiChiara Br., p. 5.)

- When Prichard stated SEP would not change its policy on August 27, this suddenly "***indicat[ed] to DiChiara that SEP and SEH would not properly evaluate medical and religious exemptions, and thus raising serious concerns that both organizations were violating the ADA and Title VII***." (*Id*., p. 9; emphasis in original).

- "In late August, 2021," another physician asked her to provide her private emails with Prichard and Colvin to Deters Law "***in order to further the Title VII and ADA claims***," so she forwarded the emails to Eric Deters  on August 31 to "***ensure that, ultimately, Title VII and ADA claims would be advanced successfully***." (*Id*., p. 7-8; emphasis in original.)

- Thus, DiChiara's clandestine forwarding of emails to a suspended former lawyer at 2:21 a.m. was all because she "***thought there could be violations of the law***" and she was just "***provid*[*ing*] *information to an attorney to substantiate those claims***." (*Id*., p. 9-10; emphasis in original.)

The problem for DiChiara is that each of these assertions is contradicted by the contemporaneous representations from her and her counsel in September 2021.  In fact, even the subsequently-discovered full set of emails with Eric Deters that she declined to provide to SEP fail to support these assertions, for none of them mention

alleged thoughts or concerns about violations of Title VII or the ADA based on how SEP was processing religious and medical exemption requests.[8]

But in terms of confirming this is a litigation narrative, the coup de grâce is the testimony DiChiara cites for it (pages 120-122 of her deposition) was provided when she returned from a lunch break with her counsel and (conveniently) asked to "go back and kind of answer something you asked earlier about, like my intentions of emailing Eric Deters on I think August 31[.]" (DiChiara Dep., R. 50, Page ID# 2603:4 – 2604:23.)  Only then did DiChiara claim for the first time she was "fueled" to forward confidential emails due to "concerns" about legal violations.  (*Id.*)

The Court need not determine whether DiChiara actually held these "thoughts" or "concerns," for unless SEP is charged with notice of them via some form of telepathy, they cannot establish protected activity or notice as a matter of law.  And with the protected activity façade in shambles, the remaining claims fail in unison.  The Court should affirm summary judgment on all claims.

---

[8] The emails DiChiara declined to provide in real time are found at R. 50-4, R. 50-9, R. 50-12, R. 50-22, R. 50-29, and R. 50-34.  While the Court should ignore all of DiChiara's references to these emails because SEP was not on notice of them, it is telling that DiChiara is mischaracterizing these emails too.  (*Contrast* DiChiara Br., p. 8, which claims the phrase "store as ammunition" in an undisclosed email meant "***ensur[ing] that, ultimately, Title VII and ADA claims would be advanced successfully***;" *with* DiChiara Dep., R. 50, Page ID# 2584:2-15, where she testified that phrase meant "regarding the case in all," not just Title VII/ADA claims.)  The extraordinary amount of emphasis in DiChiara's Brief is a prime example of overcompensation—although it does provide a quick reference guide to the many mischaracterizations and putative silent thoughts on which DiChiara bases her case.

## STANDARD OF REVIEW

The Court reviews a summary judgment decision de novo. *Smyer v. Kroger Ltd. P'ship I*, 2024 WL 1007116, at *3 (6th Cir. Mar. 8, 2024). "When reviewing cross-motions for summary judgment, [the Court] must evaluate each motion on its own merits and view all facts and inferences in the light most favorable to the nonmoving party." *Id*. "The fact that the parties have filed cross-motions for summary judgment does not mean, of course, that summary judgment for one side or the other is necessarily appropriate." *Id*. "[W]hen a district court grants summary judgment, we can affirm on any ground supported by the record and raised below." *Patterson v. Kent State Univ.,* 2025 WL 2630307, at *4 (6th Cir. Sept. 12, 2025).

## ARGUMENT

DiChiara lodges snide accusations about the District Court "ignoring" evidence and engaging in "nonsensical" reasoning, but she takes no real issue with its analytical framework. She just argues the District Court was so wrong that summary judgment in Defendants' favor should be reversed and entered in her favor.

As shown below, the District Court engaged in the proper analysis, applied the correct legal standards, viewed the evidence in her favor, and found against DiChiara on a dozen or so issues. The ruling should be affirmed for the reasons relied upon by the District Court—plus other reasons supported by the record.

13

I.    **Defendants were entitled to judgment on Title VII/ADA Retaliation.**

The District Court first rejected DiChiara's argument that this was a direct-evidence case, finding she had "not produced direct evidence of unlawful retaliation." (Opinion, R. 72, Page ID# 3538.) The District Court then found she had failed to demonstrate a genuine issue of material fact on protected activity and notice. (*Id*., Page ID# 3538-3549.) The District Court was correct on those two elements, but the record also supports summary judgment on causation and pretext.

A.    **The District Court correctly ruled on protected activity.**

The first element a retaliation plaintiff must demonstrate is protected activity. *Kirkland v. City of Maryville, Tennessee*, 54 F.4th 901, 910 (6th Cir. 2022). Under either Title VII or the ADA, a plaintiff has engaged in a "protected activity" if she has "participated in … an investigation, proceeding, or hearing" or "opposed" an unlawful practice under the applicable chapter. 42 U.S.C. § 2000e-3(a) and 42 U.S.C. § 12203(a). DiChiara cannot establish participation or opposition.

1.    **The District Court correctly determined DiChiara's conduct "clearly" did not trigger the participation clause.**

DiChiara argues that under *Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714 (6th Cir. 2008), protected activity occurs anytime "an employee provides documents to an attorney litigating a Title VII or ADA claim '***reasonably believing***' that the documents are relevant to those claims." (DiChiara Br., p. 25; emphasis in original.) She claims she "participated … in the *Beckerich* ADA and Title VII lawsuit" by

14

forwarding emails to Eric Deters that she believed were "relevant and material" to "Title VII and ADA claims in a filed lawsuit[.]"[9]  (*Id.*, p. 25-26.)

The District Court—without even resorting to the timeline—properly recognized that the dispositive question was not what DiChiara believed, but whether her conduct could be characterized as "participation" in *Beckerich II*.  The District Court noted it "strains credulity" to believe that a person can participate in a lawsuit "without being a named party, being subject to any discovery requests, or intending to initiate legal action in any way[.]"  (Opinion, R. 72, Page ID# 3543.)

This notion derives from the very case DiChiara relies upon—the defense-summary judgment case of *Niswander*—where it was undisputed the plaintiff was an active participant in a Title VII lawsuit because she opted in as a class member and then provided documents in response to discovery requests.  *Niswander*, 529 F.3d at 717-18.  Similarly, this Court has also held that the absence of "direct participation" in another's lawsuit means "the participation clause does not apply."  *Aldrich v. Rural Health Servs. Consortium, Inc.*, 579 F. App'x 335, 336 (6th Cir. 2014) (rejecting participation argument under *Niswander* because the plaintiff—who

---

[9] The phrase "filed lawsuit" is a mischaracterization. The unredacted emails produced in discovery prove she forwarded emails to Eric Deters at 2:21 a.m. on August 31, 2021.  (8/31/21 First Forwarding of Emails, R. 50-23, Page ID# 2918; 8/31/21 Second Forwarding of Emails, R. 50-24, Page ID# 2921.)  As a matter of fact, there was no "filed lawsuit" on August 31, for *Beckerich I* had been voluntarily dismissed on August 29 and *Beckerich II* was not filed until September 3.  This timeline is why DiChiara does not distinguish between *Beckerich I* and *II*.

had forwarded confidential work emails to her personal account which were relevant to a co-worker's suit—"was not directly involved in any litigation, or responding to any requests").  Thus, the District Court framed the issue correctly and appropriately rejected DiChiara's insistence that relevance of the documents (or belief of relevance) is the ultimate inquiry under *Niswander*.  *See also Barnard v. Powell Valley Elec. Coop.*, 2022 WL 1261831, at *9 (6th Cir. Apr. 28, 2022) (summarizing *Niswander*: "[w]e have held that an employer may terminate an employee for surreptitiously taking company documents[,] … even when those documents may be relevant to a discrimination claim.")

Applying these principles, it is clear DiChiara was not "participating in" *Beckerich II*, "directly involved" with it, or even "assisting with" it.  She was never a plaintiff; never opted in as a class member; and did not forward emails in response to discovery requests.  Rather, according to her representations of "facts and intent," it was "never [her] intent" to seek litigation, Deters Law was not authorized to use the emails in litigation.  (9/5/21 Apology, R. 50-36, Page ID# 3044-3047.)

Even more glaring are the representations from DiChiara's counsel, who would know how to invoke statutory protections if, in fact, DiChiara was participating in *Beckerich II* or assisting with *Beckerich II*:

- Deters Law "wanted Dr. DiChiara to be a part of and participate in as a party, and she declined to do so." (9/15/21 Email, R. 44-49, Page ID# 1009.)

- DiChiara "broke off communication" when she realized Deters Law was "interested in litigation" she "did not feel comfortable pursuing"—namely, *Beckerich II*.  (9/13/21 Email, R. 44-46, Page ID# 1001.)

- Deters Law had "sought her assistance with" *Beckerich II*, but DiChiara would not do so and would "vigorously fight" efforts by Deters Law to seek her assistance.  (9/13/21 Email, R. 44-46, Page ID# 1001.)

These representations, which SEP was entitled to rely upon when determining whether she could be lawfully terminated, defeat any suggestion that she was engaging in protected activity by participating in or assisting with *Beckerich II*.[10]

In light of the representations in real time, the District Court reasoned that granting her broad, participation-clause protection would provide "near-immunity." (Opinion, R. 72, Page ID# 3544.)  This concern was first raised in *Niswander*, wherein this Court refused to apply such protection to a plaintiff who was, in fact, actively participating in a protected lawsuit by responding to discovery requests. *Niswander*, 529 F.3d at 722.  Concern about "near-immunity" is even more significant here, for a finding of participation would require the Court to assume DiChiara and her counsel were misrepresenting her "facts and intent" in writing.

---

[10] This is what the District Court was referring to when it found that DiChiara's "post hoc assertion of relevance is contrary to the facts of this case."  (Opinion, R. 72, Page ID# 3544.)  That is, unless she and her counsel were lying to SEP in real time, she was not providing putatively relevant documents to participate in/assist with *Beckerich II*.  In addition, while the District Court appropriately found that the "internal, private communications" exchanged with Prichard and Colvin were "simply not relevant to whether religious or medical exemptions … would be unduly burdensome"—this was a secondary finding that was not integral to the District Court's ruling on the participation clause.  (Opinion, R. 72, Page ID# 3544-45.)

17

Finally, "when confidential information is at issue, a reasonableness requirement is appropriate" on a participation claim. *Niswander*, 529 F.3d at 726. The standard DiChiara is advocating for—*i.e.*, participation-clause protection for an individual who forwards confidential emails to a suspended former lawyer, which emails do not mention discrimination concerns and are not cited as support for statutory claims, and whose counsel represents she "declined" to participate in the lawsuit and will "vigorously fight" any attempt to have her assist with the lawsuit—cannot possibly be the legal standard for reasonable participation in this circuit.

### 2.    The Court can also reject participation-clause protection on the grounds that no EEOC charge was pending.

Beyond DiChiara's non-participation as a matter of fact and law, Defendants also raised a threshold issue based on the rule that "instigation of proceedings leading to the filing of a complaint or a charge [with the EEOC] … is a prerequisite to protection under the participation clause." *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir. 1989). The District Court "set aside" this issue because it was clear DiChiara's conduct did not amount to participation, but this Court affirms dismissal when, as is the case here, there was no EEOC charge pending at the time of termination. *Hamade v. Valiant Gov't Servs., LLC*, 807 Fed. Appx. 546, 550 (6th Cir. 2020) (affirming dismissal because "there was no pending EEOC investigation or charge by [plaintiff] or anyone else at the time of his termination as required by our precedent in order to proceed with a retaliation claim under the

18

participation clause.")  DiChiara argues *Fort Bend Cnty., Texas v. Davis*, 87 U.S. 541 (2019) has overruled this fundamental rule in the Sixth Circuit, but *Davis* reaffirmed that filing an EEOC charge is a mandatory requirement; it is just not a jurisdictional requirement (meaning a defendant cannot raise lack of subject matter jurisdiction as a defense after answering).  *Id*. at 552.  *Booker* and *Hamade* (which postdates *Davis*) remain good law, and they are fatal to DiChiara's participation argument.

### 3.    The District Court correctly held that any putative opposition was unreasonable and thus not protected.

The opposition clause covers "complaining … about allegedly unlawful practices; refusing to obey an order because the worker thinks it is unlawful under Title VII; and opposing unlawful acts[.]"  *Johnson v. Univ. of Cincinnati*, 215 F.3d 561, 579 (6th Cir. 2000).  Even when an employee has engaged in oppositional activity, "the manner of opposition must be reasonable."  *Id*.  For instance, an employee is not protected by the opposition clause when he "violates legitimate rules and orders of his employer, disrupts the employment environment, or interferes with the attainment of his employer's goals."  *Booker*, 879 F.2d at 1312.

In the context of disclosing confidential information, this Court has developed six factors for assessing the reasonableness of oppositional activity.  *Niswander*, 529 F.3d at 726.  Here, the District Court correctly determined that only the first factor— how the documents were obtained—weighed in DiChiara's favor.  (Opinion, R. 72,

Page ID# 3547.)  Thus, the District Court held: "to the extent that Plaintiff engaged in opposition, that opposition was not reasonable." (*Id*., Page ID# 3546.)

Regarding the second factor—to whom the documents were produced—the District Court reasoned that forwarding emails to a suspended lawyer "counts against" her.  (*Id*.)  DiChiara argues this factor favors her because Eric Deters was a representative of a firm that "undisputedly, represented her[.]"  (DiChiara Br., p. 33.)  But, this assertion is false, for DiChiara told SEP she "never asked Deters Law to represent me."  (9/5/21 Apology, R. 50-36, Page ID# 3047.)  Thus, her forwarding of confidential emails was not a production to a lawyer to pursue statutory claims; it was a production to a non-lawyer who, in her words, "exploited" her.[11]  (*Id*.)

Regarding the third factor—the content of the documents—DiChiara argues the District Court "ignored" evidence that vaccine efficacy is relevant to Title II/ADA claims.  (DiChiara Br., p. 34.)  The District Court did not ignore evidence; it reasoned there was a "plausible basis" to believe her 27-page letter was relevant, but the same could not be said for the "internal, private communications" in Exhibit 3.  (Opinion, R. 72, Page ID# 3544-3545.)  Certainly DiChiara could have shared her letter while stopping short of forwarding private, confidential, internal emails.

---

[11] A theme underlying DiChiara's case is the notion that Eric Deters is the wrongdoer because he utilized the emails in litigation without permission.  But even if true, it was DiChiara who sailed too close to the wind, thus she must bear the consequences.

Regarding the fourth factor—why the documents were produced, including whether it was in response to a discovery request—DiChiara claims the District Court "simply ignored" this factor. (DiChiara Br., p. 34.) To the contrary, the District Court noted the obvious: she forwarded the confidential emails "of her own volition, not in response to a discovery request." (Opinion, R. 72, Page ID# 3547.)

Regarding the fifth factor—scope of the privacy policy—the District Court found that DiChiara "flouted" SEP's "broad confidentiality and privacy policies with respect to communications between associates." (*Id.*) DiChiara now argues there is a "question of fact as to whether the emails are included in Defendants' privacy policy." (DiChiara Br., p. 35.) This argument fails because the interpretation of written documents (*e.g.,* SEP's policies at R. 50-45, R. 50-46, and R. 50-47) is a question of law for the Court; because the private emails exchanged with the CEOs clearly fall within the plain language of the policies; and because DiChiara had argued to the District Court in her own motion that there were no questions of fact.

Regarding the sixth factor—whether the emails could be preserved without violating the privacy policy—the District Court correctly observed that DiChiara "was never asked to delete those emails," thus they "could have been preserved without sending them to a third party." (Opinion, R. 72, Page ID# 3547.) DiChiara now claims "it is unclear whether there was any other way to preserve this evidence at the injunctive stage[,] … where discovery was not available." (DiChiara Br., p.

35.)  However, it is not as if the emails would have disappeared from DiChiara's email account if she did not forward them to Eric Deters at 2:21 a.m. on August 31. Further, DiChiara knows the assertion about discovery not being available is false, for she herself was issued a discovery request (*i.e.*, a subpoena).  (9/15/21 Email, R. 44-49, Page ID# 1009.)  DiChiara ignores the subpoena not only because it defeats her argument about the unavailability of discovery, but also because her counsel's demand to retract the subpoena defeats any suggestion that she was trying to participate in or assist with *Beckerich II*.  (*Id*.) Yet again, the actual facts—not DiChiara's mischaracterizations of them—defeat her arguments at every turn.

### 4.    The Court can also affirm for lack of an opposition.

The District Court ruled on reasonableness without analyzing the threshold issue of whether DiChiara actually engaged in oppositional activity.  However, the absence of an opposition is an additional basis to affirm summary judgment.

In the opposition case cited by DiChiara, the Supreme Court held that the opposition clause protects an employee who "speaks out about discrimination" or "reports discrimination on her own initiative … [or] when her boss asks a question." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 273 and 278 (2009).  The key element is an accusation of discrimination—because merely objecting to an employer's decision based on reasons other than unlawful discrimination is insufficient. *Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d

1304, 1313 (6th Cir. 1989) ("[T]he letter … is not in opposition to a violation of [Title VII]. Booker was not contesting any unlawful employment practice; he was contesting the correctness of a decision made by his employer.").

Here, DiChiara did not speak out about or report discrimination. Nor did any of her communications with SEP contest the vaccination policy on the basis of religious or disability discrimination. As found by the District Court, DiChiara "never communicated with SEP that she believed their vaccination policy was illegal." (Opinion, R. 72, Page ID #3555.) Rather, DiChiara's communications all contested the correctness of SEP's decision to require vaccination on medical and scientific grounds. As a matter of law, that is not oppositional activity.

## B.     The District Court correctly ruled on notice.

The notice element of a retaliation claim considers whether an employer "understood [an] accusation as a Title VII [or ADA] protected complaint." *Crawford v. Chipotle Mexican Grill, Inc.*, 773 F. App'x 822, 827 (6th Cir. 2019). Regarding the level of specificity needed to put an employer on notice of protected activity, "merely lobbing a vague charge of discrimination at an employer will not suffice, … [but] [a]t the same time, an accusation need not be lodged with absolute formality, clarity, or precision." *Id.* at 828. "The governing principle from our caselaw is not that magic words must be intoned but that the language used be enough, in a specific factual context, to convey the accusation [of discrimination] and its basis." *Id.*

23

In *Crawford*, the factual context was that on previous occasions, an African-American employee (Crawford) had confronted her Hispanic manager (Torres) several times alleging favoritism to Hispanic employees. *Id*. at 824. The language at issue was Crawford accusing Torres of "discriminating against" an African-American employee for not paying back pay. *Id*. at 825. This Court held that this context and language was barely enough to survive summary judgment:

> Here, the accusation did not come out of left field—Crawford had previously approached Torres with complaints of racial favoritism—and she specifically identified the failure to pay Shelton's back pay as the discriminatory practice. That Torres immediately responded to Crawford's claim of "discrimination" with a claim that she was instead (or also) guilty of race discrimination ("the only reason she was defending ... Shelton was because [she is black]") also adds context. … In this particular context, accusing Torres of "discriminating against" and "harassing" Shelton is just enough to get past summary judgment.

*Id*. at 829. *Crawford* demonstrates how protected activity and notice are essentially two sides of the same coin, for an employee does not engage in protected activity—and the employer is not on notice of protected activity—if the employee's language, when taken in context, does not convey an accusation of discrimination on the basis of a protected characteristic. *See also Haydar v. Amazon*, 2021 WL 4206279, *6 (6th Cir. Sept. 16, 2021) (affirming summary judgment because complaints by a Muslim of Syrian descent regarding alleged cronyism and illegal activity did not put his employer on notice he was alleging discrimination on the basis of his religion or national original, and thus his complaints "cannot constitute protected activity.")

### 1. DiChiara's language, in context, did not provide notice.

Like the District Court, the Court can examine every single one of DiChiara's communications with SEP and conclude that none of them alleged religious or disability discrimination on the basis of some sort of corrupted exemption process. But the communications go much further than omission, for they affirmatively negated any notion that she was complaining about discrimination. Using the baseball analogy from *Crawford*, the putative "serious concerns" about religious discrimination under Title VII and disability discrimination under the ADA—on the basis that SEP would not properly evaluate religious and medical exemption requests—came out of left field at a deposition two years later. Thus, the District Court correctly found that DiChiara's communications were insufficient to support an inference SEP "knew that Plaintiff had engaged in protected activity in response to what she believed to be unlawful conduct." (Opinion, R. 72, Page ID# 3549.)

### 2. SEP did not admit notice of protected activity.

In an effort to sidestep her own language and context, DiChiara argues the District Court "ignored … admissions establishing that Defendants knew of [her] protected conduct." (DiChiara Br., p. 35.) First, she claims Prichard admitted he knew about her putative assistance with and/or participation in the Title VII and ADA claims asserted in *Beckerich II*. In reality, Prichard testified as follows:

- "[I]f she's concerned about a Title VII or ADA, there's no mention of that anywhere in any communication between me and her and Garren [Colvin]." (Prichard Dep., R. 45, Page ID# 1834:2-4.)

- "Never did we discuss anything that pertained to exemptions, how [SEP] would handle such things." (*Id*., Page ID# 1855:20-22.)

Prichard also denied that the private emails she forwarded to Eric Deters "had anything in the world to do with Title VII or ADA[.]"[12]  (*Id*., Page ID# 1842:9-11.)

Also, the full context of the testimony DiChiara cites for Prichard's alleged admission (contained in bold emphasis on page 12 of her Brief) was as follows:

Q.    … I'm not here to get into what was in Eric Deters' mind because that's an abyss that no one wants to go down, but at the end of the day, the firm attached those e-mails to that suit [*i.e.*, *Beckerich* II] that brought those [Title VII/ADA] claims.  You don't dispute that, right?

A.    I don't dispute that.  I also do not dispute that Amy said she did not share them with them for that reason and that --

Q.    When did she say that?

A.    In her apology letter.

*****

---

[12] To the extent DiChiara is implying that Prichard's testimony can satisfy the protected activity element, she is wrong.  In *Niswander*, it was undisputed the plaintiff was participating in a protected lawsuit as a factual matter, but her case still failed on summary judgment because the delivery of irrelevant documents did not constitute participation as a legal matter.  *Niswander*, 529 F.3d 714 at 721.  Similarly, even if Prichard testified he believed DiChiara was participating in *Beckerich II* (which he did not), that would not establish participation as a matter of law.

Q.    Where in DiChiara's Exhibit 40 letter does she say that the e-mails were not provided in furtherance of the lawsuit or the Title VII or ADA claims?

A.    Well, I'd still go to the second paragraph and say, first, please know that I did not authorize Deters Law to publicize those e-mails or any other documents that I had authored regarding the vaccines and on the vaccine mandate issued by St. Elizabeth Healthcare.  I certainly do not approve of the use for exhibits[.]

*****

Q.    … Do you even know what was discussed between her and Mr. Deters?

A.    I would have no way of knowing other than what she told us.

Q.    Okay. Would you agree or did you think DiChiara was assisting Mr. Deters in bringing the lawsuit?

A.    I sure think she was assisting him, yes.

Q.    Do you think she participated in any manner by providing him the e-mails in the lawsuit?[13]

A.    Yes.  And I'll say either knowingly or unknowingly.

*****

Q.    Okay.  And if she did that [*i.e.*, use company e-mails to communicate with Eric Deters] in furtherance of or to assist or participate in a Title VII or ADA lawsuit, is that a violation of the policy?

---

[13] When this question is cited in DiChiara's Brief, it reads: "Do you think she participated in any manner [in the lawsuit] by providing him the e-mails in the lawsuit?" Apparently DiChiara herself believes the question was so broad and/or confusing that it requires a self-serving parenthetical to make sense of it.

A.    We have a corporate compliance policy, as we mentioned, so she has a right do that.  There's no indication she had anything to do with Title VII or ADA.

Q.    Besides the fact that her e-mails were attached to a lawsuit that brought ADA and Title VII –

A.    Just by happenstance.

(Prichard Dep, R.  45, PageID# 1846:9:7 – 1857:10.)

As the full context shows, Prichard admitted undeniable facts—*e.g.,* the emails were attached to *Beckerich II*, in which other associates (not DiChiara) alleged Title VII/ADA violations—but he repeatedly denied being aware of any activity by DiChiara that implicated Title VII or the ADA.  In fact, he interpreted DiChiara's Apology as a representation that she was not assisting with or participating in the Title VII/ADA claims.  This is why DiChiara can only cherry-pick responses to very broad questions to support this argument.  It is false.

DiChiara also argues SEP's corporate representative, Jacob Bast, admitted notice of protected activity by "admit[ting] the  central focus of *Beckerich* [*II*] was the ADA and Title VII."  (DiChiara Br., p. 14.)  This is another mischaracterization, for Mr. Bast only admitted the undeniable—that the Title VII and ADA claims were listed as Counts I and II in *Beckerich II*, and thus those claims fell within the "subject matter" of the 93-page, 23-claim *Beckerich II* Complaint.  (Bast Dep., R. 46, Page ID# 2030:14 – 2031:7.)  DiChiara manufactured the term "central focus," while

28

simultaneously trying to transform the broad phrase "subject matter" into "Title VII/ADA claims" specifically.  No one admitted notice of protected activity.

### 3.   The Termination Letter does not establish notice.

DiChiara argues the Termination Letter proves notice, because "Defendants put in writing that they knew she was engaged in protected activity and fired her because of her participation."   (DiChiara Br., p. 36.)   This is yet another mischaracterization, for the letter merely stated that one basis for termination was the disruptive and unprofessional disclosure of emails related to the subject matter of *Beckerich I* and *II*.  (10/4/21 Termination Letter, R. 50-44, Page ID# 3107.)  Any email containing "COVID-19" related to the subject matter of those lawsuits, but that certainly does not mean the sender was participating in litigation or assisting with Title VII/ADA claims.  In fact, DiChiara proved to be the prime example of that, for her counsel had represented to SEP that she had "declined" to participate in litigation and would "vigorously fight" efforts to seek her "assistance with" the case. (9/15/21 Email, R. 44-49, Page ID# 1009; 9/13/21 Email, R. 44-46, Page ID# 1001.)

DiChiara also claims the (surreptitiously) recorded termination meeting proves notice, because Prichard stated "he fired her *because of her participation in Beckerich*." (DiChiara Br., p. 36-37; emphasis in original.)  In reality, Prichard stated she had "really violated our trust," and "whether you meant for it to be used or not[,] … it violated several of our policies, and we just don't feel that we can continue to

29

trust you[.]"  (10/4/21 Audio Recording, R. 55, at 03:45 – 04:08.)  Neither Prichard nor DiChiara said anything about participation in *Beckerich II*, because no such participation occurred.  DiChiara's attempts to insert phrases like "participation" and "Title VII/ADA" into documents and discussions *ex post facto* must be rejected.

### 4.    DiChiara's request for a "negative inference" is baseless.

DiChiara's final argument is that the District Court "failed to draw a negative inference" that counsel informed Prichard about her termination being unlawful, and "he chose to do so anyway."  (DiChiara Br., p. 37.)  First, as recognized by the District Court, an advice-of-counsel defense operates as a waiver of privilege, and DiChiara provides no authority supporting a "negative inference" as a penalty for not waiving privilege.[14] (Opinion, R. 72, Page ID# 3549, fn. 4.) Second, this case demonstrates the flawed assumption of such an inference—whereas DiChiara falsely assumes counsel advised against termination, she asks the Court to ignore the other natural inference (and reality) that counsel also believed termination was lawful. Third, DiChiara fails to explain how such an inference would establish notice— unless she is suggesting it was counsel who possessed the telepathic ability to read her "thoughts" and "concerns," and thus it was counsel who knew DiChiara was

---

[14] When it comes to privilege, DiChiara wants to have her cake and eat it too.  On the one hand, her decision to stand on a (tenuous) privilege with a non-lawyer was just an invocation of her rights—but when Prichard stands on privilege, somehow that leads to a negative inference that the communications were adverse to him.  This inference does not exist, but if it did, DiChiara cannot have it both ways.

really engaging in protected activity (without telling anyone).  The District Court was correct: DiChiara failed to put SEP on notice of any putative protected activity.

### C.    The Court can affirm summary judgment for lack of causation too.

Due to its holdings on protected activity and notice, the District Court determined it "need not address" causation. (Opinion, R. 72, Page ID# 3539.)  But elsewhere, the District Court rejected the "premise that she was retaliated against for engaging in statutorily protected activity[.]"  (*Id.*, Page ID# 3556.)

In this case, causation happens to correspond with the second phase of the *McDonnell Douglas* burden-shifting framework: the employer's burden to offer a legitimate nondiscriminatory reason for termination.  That is because if SEP had such a reason, there would be no but-for causation as between any putative protected activity and the termination.  Once again, this Court's opinion in *Niswander* provides the answer: "even if we were to assume … a prima facie case of retaliation[,] … her delivery of confidential documents is a legitimate nondiscriminatory reason" for termination.  *Niswander v. Cincinnati Ins. Co.,* 529 F.3d 714, 727-28 (6th Cir. 2008); *MacEachern v. Quicken Loans, Inc.*, 2017 WL 5466656, at *3 (6th Cir. Oct. 17, 2017) (citing *Niswander*: "Even assuming that MacEachern could make out a prima facie case, we have determined that an employee's dissemination of confidential information is a legitimate non-discriminatory reason for termination.")

Here, DiChiara forwarded confidential email exchanges with the CEOs of her employer and the hospital system, which emails were subject to privacy policies, to Eric Deters.  On this basis, the District Court correctly found that SEP had four independent bases to terminate DiChiara for cause under her Employment Agreement.  (Opinion, R. 72, Page ID# 3551-3556.)  Pursuant to *Niswander*, the forwarding of confidential documents provided a legitimate, non-discriminatory reason for termination—defeating the causation element. Further, Prichard testified the "trigger point" for termination was DiChiara's Apology, wherein she effectively negated protected activity.  (Prichard Dep., R. 45, Page ID# 1770:23 – 1771:14.) Thus, for both legal and factual reasons, lack of causation is another basis to affirm.

### D.    The Court can also affirm for lack of pretext.

Once an employer proffers a legitimate nondiscriminatory reason, "the burden returns to [the employee] to show that these proffered reasons were pretextual." *Bashaw v. Majestic Care of Whitehall, LLC,* 130 F.4th 542, 548 (6th Cir. 2025).[15] However, "an employer can defeat a pretext argument if it can show that it 'honestly believed' its proffered reason."  *Id*. at 552.  The honest-belief rule "provides that an employer is entitled to summary judgment on pretext even if its conclusion is later

---

[15] DiChiara does not mention the District Court's conclusion that this is not a direct-evidence case; nor does her Brief assert this is a direct-evidence case.  So, she has either abandoned the direct-evidence argument, or she plans to improperly raise it in her Reply.  Regardless, the District Court was correct: there is no evidence requiring a conclusion of unlawful retaliation, thus burden-shifting applies.

shown to be mistaken, foolish, trivial, or baseless." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 590-91 (6th Cir. 2014). To rebut the rule, "the plaintiff must offer some evidence of an error … that is too obvious to be unintentional." *Id.*

Here, Prichard stated in the Termination Letter, during the October 4th meeting, and during his deposition, that he believed (correctly, as found by the District Court) DiChiara's conduct violated multiple policies and provisions of her Employment Agreement. Nothing in the record would allow DiChiara to carry the ultimate burden of showing "an error … that is too obvious to be unintentional." Thus, as was the case in *Niswander*, summary judgment can also be affirmed for failure of pretext. *Niswander*, 529 F.3d at 728-29 ("even if the decision to terminate … ultimately proved to be flawed, Niswander has failed to show the presence of a genuine issue of material fact regarding Stoneburner's honest belief that she violated the company's privacy policy.") This is another independent basis to affirm, even if the Court accepts DiChiara's tenuous protected activity and notice arguments.

### E.    The claim for Title VII/ADA Retaliation also does not apply to St. Elizabeth.

The District Court did not reach the secondary question of whether St. Elizabeth could be liable (in addition to SEP) if DiChiara was able to prove statutory retaliation. (Opinion, R. 72, Page ID# 3539.) However, all three theories advanced against St. Elizabeth fail as a matter of law.

33

### 1.    St. Elizabeth was not DiChiara's "joint employer."

A joint employer exists when the actual employer is effectively a "nonentity" in the workplace. *E.E.O.C. v. Skanska USA Bldg., Inc*., 550 Fed. Appx. 253, 256 (6th Cir. 2013). Courts "look to an entity's ability to hire, fire or discipline employees, affect their compensation and benefits, and direct and supervise their performance." *Id*. None of these "joint employer" factors are present here.

First, only SEP had the ability to hire, direct, or fire DiChiara. Colvin testified St. Elizabeth "doesn't hire for SEP;" cannot direct SEP to terminate a physician; and did not instruct SEP to terminate DiChiara—Colvin was just given a "heads up" about it by Prichard. (Colvin Dep., R. 47, Page ID# 2163:17; Page ID# 2153:2-13; Page ID# 2226:14 – 2228:5.) Prichard confirmed St. Elizabeth had no right to control the terms of physician employment; it had no right to terminate DiChiara; and he was the one, as CEO of SEP, who decided to terminate her. (Prichard Dep., R. 45, Page ID# 1873:4-13; Page ID# 1821:2-4.)

Second, SEP set DiChiara's compensation and benefits. While St. Elizabeth establishes a general formula, it does not set individual physician compensation. (Colvin Dep., R. 47, Page ID# 2148:20-25.) Rather, SEP sets compensation by reviewing annual market data to establish a rate of pay and by measuring physicians against value-based measures defined by SEP's board. (Bast Dep., R. 46, Page ID# 1944:4 – 1950:12.) DiChiara was also paid by SEP, issued W-2's by SEP, and

provided benefits by SEP. (*Id.*, Page ID# 2130:8-14; Page ID 2124:21 – 2126:13.) These circumstances are clearly insufficient to establish a joint employer. *Nethery v. Quality Care Investors, L.P.*, 814 Fed. Appx. 97, 103 (6th Cir. 2020) (affirming summary judgment where employer set the rate of pay; paid the wages; issued W-2's; provided the benefits; and supervised performance—and where the only influence held by the other entity arose from the employer taking account of the other entity's wishes when the employer exercised its own power).

### 2.    St. Elizabeth and SEP are not an "integrated enterprise."

For the first factor, the "elements of interrelatedness" are common offices, common record keeping, and shared bank accounts and equipment. *Sanford v. Main Street Baptist Church Manor, Inc.*, 449 Fed. Appx. 488, 494 (6th Cir. 2011). DiChiara does not argue for any of these elements, because they are not supported by the record. *Swallows v. Barnes & Noble Book Stores, Inc.,* 128 F.3d 990, 994 (6th Cir. 1997) (holding this factor not met because the two entities kept their own records and maintained separate bank accounts and offices, and because standard lease terms inherent to operating a bookstore do not show interrelatedness).

Regarding the second factor—common management—DiChiara argues integrated enterprise liability exists when the president of one company is also a director/officer of another. (DiChiara Br., p. 40.) That is a gross oversimplification of the case she cites, which involved a parent company exercising excessive control

35

over a subsidiary by approving virtually all purchases, handling all accounting and payroll, and actually hiring the plaintiff. *See Armbruster v. Quinn*, 711 F.2d 1332, 1338-39 (6th Cir. 1983), abrogated on other grounds by *Arbaugh v. Y&H Corp.*, 546 U.S. 500 (2006). This Court has more recently held that the sharing of a small percentage of board members between parent and subsidiary does not satisfy the common management factor, because it does not equate to excessive control in the parent/subsidiary context. *Sanford*, 449 Fed. Appx. at 494-95.

Regarding the third (and most important factor)—control over labor relations—the critical question is which entity made "final decisions" regarding the plaintiff's employment. *Swallows*, 128 F.3d at 995 ("At most, the evidence shows that TTU had a voice in certain employment decisions[,] … not that it controlled those decisions in the manner seen in single employer situations."); *Satterfield v. Tennessee*, 295 F.3d 611, 618 (6th Cir. 2002) (holding no reasonable jury could find a single employer where the Department of Safety's Commissioner testified he made "the final decision" on the plaintiff's employment). Here, only SEP had the authority to fire DiChiara—and Prichard exercised that authority by making the "final decision" to fire her.[16] (Prichard Dep., R. 45, Page ID# 1821:2-4.)

---

[16] Beyond being wrong about the general principles for the joint employer and integrated enterprise tests, DiChiara has also presented no authority suggesting a hospital and physician group can meet them. *But see Perry v. VHS San Antonio Partners, L.L.C.*, 990 F.3d 918, 928-30 (5th Cir. 2021) (affirming summary judgment on both tests even where the plaintiff was fired upon the demand of the hospital).

36

The final factor is phrased as "common ownership or financial control," but it has been interpreted as whether either entity is a "sham." *Sanford*, 449 Fed. Appx. at 495 ("[W]ithout evidence of a sham, the fourth factor is not met.")  Here, St. Elizabeth may be considered a parent and SEP a subsidiary (which is a common corporate structure), but under no circumstances can either be considered a "sham." Both corporations maintain distinct legal identities; they are managed by separate boards; and they each employ thousands of employees.  Further, financial support by a parent does not mean the subsidiary is a sham that can be disregarded. *York v. Tennessee Crushed Stone Ass'n*, 684 F.2d 360, 362-63 (6th Cir. 1982).

### 3. St. Elizabeth did not interfere with her employment either.

Citing *Christopher v. Strouder Mem'l Hosp.*, 936 F.2d 870 (6th Cir. 1991), DiChiara argues St. Elizabeth interfered with her employment by terminating her privileges. (DiChiara Br., p. 42.) But, her privileges were terminated on October 5 as a consequence of being fired by SEP on October 4.  This timeline renders *Christopher* inapposite, because in that case the hospital—which maintained control over a nurse's employment with physicians because her job was contingent upon hospital privileges—denied the nurse privileges, thereby preventing her from working. *Id*. 872-73; *Nethery*, 814 Fed. Appx. at 104 ("Reliant at all times held the sole power to remove[.] … So that makes this case unlike *Christopher*, where the [hospital's] conduct made it impossible for the plaintiff to work for her employer").

## II.    Defendants were entitled to summary judgment on KCRA Retaliation.

The District Court correctly recognized this claim failed because it is "contingent" upon the Title VII/ADA claim.  (Opinion, R. 72, Page ID# 3459.)  Also, any attempt to impose liability against Prichard and Colvin fails.

First, the intra-corporate conspiracy doctrines bars any theory that they conspired with their employer (St. Elizabeth), or that Prichard conspired with the company he was acting on behalf of (SEP).  *Roof v. Bel Brands, USA, Inc.*, 641 Fed. Appx. 492, 499 (6th Cir. 2016) (affirming dismissal based upon alleged conspiracy between corporation and manager).  Second, DiChiara has never alleged Prichard or Colvin were acting beyond the scope of their employment.  *See id*. (also dismissing for lack of allegation the manager was acting beyond an agency capacity); *Cowing v. Commare*, 499 S.W.3d 291, 295 (Ky. App. 2016) (affirming dismissal because without allegation of personal interest, the manager's actions were solely attributable to his employer).  Third, there was no agreement to fire (much less an agreement to retaliate).  Not only was the firing based on legitimate reasons; the "final decision" was made by Prichard, not Colvin.[17]  (Prichard Dep., R. 45, Page ID# 1821:2-4.)

---

[17] Another mischaracterization is the assertion that Prichard and Colvin "actually agreed upon" the firing.  (DiChiara Br., p. 54.)  Prichard testified he would have liked Colvin's support, but it was not true to say he would not have fired her if Colvin was against it.  (Prichard Dep., R. 45, Page ID# 1785:3-11.)  Colvin likewise denied he gave Prichard the "go ahead"—he just effectively told him: "thank you for keeping me informed on your decision."  (Colvin Dep., R. 47, Page ID# 2255:1-8.)

## III.    Defendants were entitled to judgment on Discharge Against Public Policy.

The District Court dismissed the claim by finding it "does not apply in this context," because DiChiara's employment was governed by a written Employment Agreement with SEP.  (Opinion, R. 72, Page ID# 3550.)  The District Court was correct, but the claim fails on the merits too.

### A.    The District Court correctly found this claim should not be "expanded" beyond at-will employment.

DiChiara argues the District Court erred by not predicting whether the Kentucky Supreme Court would allow a claim.  (DiChiara Br., p. 44.)  But the District Court did so predict.  Citing the seminal cases from 1984-2019, the District Court stated the Supreme Court has "repeatedly" described the claim as a carefully crafted and narrow "exception" to at-will employment, whereas no Kentucky case had "expanded" it beyond at-will employment.  (Opinion, R. 72, Page ID# 3550.) Put another way: the District Court reviewed the relevant law and found nothing to indicate the Supreme Court would "expand" it to the contractual context.

The District Court was correct because such an expansion to the contractual context would exceed the Supreme Court's articulation of the claim over the course of several decades.  On top of that, such an expansion would violate the Supreme Court's recognition that employers have a "legitimate interest" in having the cause

of action for wrongful discharge "clearly defined and suitably controlled." *Firestone Textile Co. Div. v. Meadows*, 666 S.W.2d 730, 733 (Ky. 1983).[18]

The District Court also rejected the argument that DiChiara was an at-will employee because either party could terminate without cause. (DiChiara Br., p. 44.) The contract provided a definite term (*i.e.*, an initial three years plus automatic one-year renewals) and established the circumstances under which the relationship could be terminated.  And relative to termination without cause, the contract required "ninety (90) days prior written notice to the other party[.]"  (Agreement, R. 50-1, Page ID# 2695.)  DiChiara cites no authority suggesting a contract containing a definite three-year term and requiring 90 days' notice for termination without cause somehow equates to an at-will relationship that can be terminated at any time, for any reason.  Finally, her assertion of a Breach of Contract claim confirms she was not an at-will employee.  *Clemans v. Nat'l Staffing Sols., Inc.*, 459 F. Supp. 3d 842, 845 (E.D. Ky. 2019) ("[A]n agreement for at-will employment does not create an enforceable contract, and thus, a breach of contract action to enforce it will not lie.")

---

[18] DiChiara claims "[e]very court that has addressed this issue" has found the claim applies to contractual employees.  (DiChiara Br., p. 47.)  She apparently did not check the neighboring state of Ohio, where the claim has long been limited to at-will employees.  *Haynes v. Zoological Soc. of Cincinnati*, 652 N.E.2d 948, 951 (Ohio 1995) ("*Greeley* provides a [public-policy] exception to the employment-at-will doctrine. Thus, … in order for an employee to bring a cause of action pursuant to *Greeley*, … that employee must have been an employee at will."); *Klepsky v. UPS, Inc.*, 483 F.3d 264, 271 (6th Cir. 2007) (affirming dismissal under *Haynes*).

**B.    The Court can also affirm summary judgment on the merits.**

Kentucky law recognizes three scenarios that can support a claim for Discharge Against Public Policy: (1) when an explicit legislative statement prohibits the discharge; (2) when the reason for discharge was the employee's failure or refusal to violate a law; and (3) when the reason for discharge was the employee's exercise of a right conferred by well-established legislative enactment. *Hill v. Ky. Lottery Corp.*, 327 S.W.3d 412, 422 (Ky. 2010). Here, scenario (1) clearly does not apply. Nor does DiChiara argue under scenario (2)—probably because anyone is free to waive privilege, and thus refusing to waive a privilege does not equate to refusing to violate a law. Thus, she is left to invoke scenario (3) and argue that she was fired for exercising a right conferred upon her by KRE 503 (*i.e.*, privilege).

This theory fails legally because the law must have an "employment-related nexus" to support a claim. *Grzyb v. Evans*, 700 S.W.2d 399, 402 (Ky. 1985). DiChiara argues KRE 503 is a "right that applies in the employment context," but that is not the standard for the nexus requirement. (*See* DiChiara Br., p. 59.) The standard is that the law must "make clear that it intends to protect employees in their employment situation." *Marshall v. Montaplast of N. Am., Inc.*, 575 S.W.3d 650, 656 (Ky. 2019). Put another way, the "primary purpose" of the statute must be the protection of employees. *Shrout v. The TFE Grp.*, 161 S.W.3d 351, 355 (Ky. App. 2005) (rejecting federal law concerning employee drug testing as the basis for a

claim, because "protection of employees is not the primary purpose of this statute and the regulations governing drug testing.")  Here, KRE 503 does not make clear that it intends to protect employees; nor is its primary purpose to protect employees.

Second, this theory fails factually because DiChiara was not terminated for refusing to waive privilege.  (*See* fn. 6, at page 9, *supra*.)  The Termination Letter stated she had been "less than forthcoming" because she had represented to SEP that she intended her communications with Deters Law to be confidential, but one of the emails in Exhibit 3 stated "Feel free to share widely," and SEP could only presume that was sent to Deters Law on account of her not providing unredacted emails. (10/4/21 Termination Letter, Doc. 50-44, Page ID# 3108.)  Thus, the fact DiChiara stood on a privilege was not a basis (much less a primary basis) for her termination. Indeed, the District Court viewed the Termination Letter and Prichard's testimony in a very Plaintiff-friendly manner and still found nothing unlawful, thus DiChiara cannot complain about not having the evidence viewed in her favor.  (*See* Opinion, R. 72, Page ID# 3537-38, characterizing both as showing that one "motivating factor" for the termination was "not fully disclos[ing]" her emails to SEP.)

## IV.    Defendants were entitled to summary judgment on Breach of Contract.

SEP needed only one contractual basis to terminate for cause, but the District Court concluded it had four.  First, the District Court correctly found that emails are SEP property, thus forwarding emails was a misappropriation.  (Opinion, R. 72, Page

ID# 3551-3552.) DiChiara argues this reasoning was "nonsensical," because emailing a lawyer about rights under Title VII and the ADA is permissible, and she testified (two years later) that is why she forwarded the emails. (DiChiara Br., p. 50.) But as the District Court found, DiChiara "had the opportunity to explain" why she sent the emails, and she "chose not to mention that she was seeking legal advice" under Title VII or the ADA. (Opinion, R. 72, Page ID# 3552.) The only "nonsensical" aspect of this issue is DiChiara's suggestion that Prichard should have ignored her representations and read her mind—or perhaps predicted her future deposition testimony—to know she was really acting for Title VII/ADA purposes.

Second, the District Court found that Section 10.2(m)—which allows termination for a policy violation as "solely determined by SEP"—is unambiguous, and SEP determined DiChiara had violated multiple policies. (Opinion, R. 72, Page ID# 3552-54.) On appeal, DiChiara recycles the same erroneous premise about statutorily protected activity and the same erroneous argument about ambiguity. (DiChiara Br., p. 51-52.) This is because she cannot reasonably dispute that forwarding confidential emails without authorization violates multiple policies, including the Electronic Forms of Communication Policy (R. 50-45, Page ID# 3109-11); her Confidentiality/Non-Disclosure Agreement (R. 50-46, Page ID# 3112); and Sections 103 and 106 of the Associate Handbook (R. 50-47, Page ID# 3117-18).

Third, the District Court found cause under Section 10.2(n) for "disruptive and unprofessional conduct." (Opinion, R. 72, Page ID# 3554-55.) DiChiara claims the District Court "held as a matter of law that … [her] conduct was not disruptive." (DiChiara Br., p. 52.) That is false, for the District Court only stated that "even if" it accepted her argument that her conduct was not disruptive, DiChiara still "did not address the fact that SEP also determined that her conduct was 'unprofessional.'" (Opinion, R. 72, Page ID# 3555.) DiChiara now tries to flip that finding on its head by claiming it was the Defendants who "*never* invoked" the "unprofessional" language in 10.2(n). (DiChiara Br., p. 52.) The falsity of that assertion is confirmed by a cursory review of the Termination letter and Defendants' summary judgment briefs. (10/4/21 Termination Letter, R. 50-44, Page ID# 3107; Motion for Summary Judgment, R. 52-1, Page ID# 3219; Response to Motion for Summary Judgment, R. 57, Page ID# 3345; Reply, R. 65, Page ID# 3441.)

Finally, the District Court found that cause existed under Section 10.2(q), which allowed termination if "SEP determines in good faith that Physician has breached a … duty of loyalty." (Agreement, R. 50-1, Page ID# 2697.) The District Court stated that even if it accepted a "questionable interpretation" of this language as an objective standard requiring honesty and lawfulness, DiChiara was not terminated for engaging in statutorily protected activity. (Opinion, R. 72, Page ID# 3556.) Actually, the District Court took a very Plaintiff-friendly view of this issue,

because under Kentucky law "a good faith belief is a determination of the state of mind of the actor," *Norton Hosps., Inc. v. Peyton*, 381 S.W.3d 286, 292-93 (Ky. 2012), and DiChiara inherently cannot dispute Prichard's subjective belief that "she had violated our trust and our loyalty by sharing our private e-mails." (Prichard Dep., R. 45, Page ID# 1790:25 – 1791:1.) Nor did DiChiara try to dispute it, for when Prichard stated on October 4 that her conduct felt like a betrayal, she admitted: "I can see why you'd view it like that." (10/4/21 Recording, R. 55, at 04:56 – 5:03.)

In short, the District Court concluded that SEP had contractual grounds to terminate (four times over). This Court need only agree with one to affirm.

## V. Defendants were entitled to judgment on Tortious Interference.

As found by the District Court, this claim fails because SEP did not breach the Employment Agreement. (Opinion, R. 72, Page ID# 3557.) It also fails because there was no intent to cause a breach by Colvin or St. Elizabeth—which requires malice or significantly wrongful conduct. Here, Prichard decided to terminate, and at most Colvin did not object. That is not tortious, let alone malicious.[19]

---

[19] Yet another mischaracterization is the claim that Prichard consulted Colvin "because they knew terminating DiChiara's employment would be illegal, and the top officer had to … personally bless that decision." (DiChiara Br., p. 54.) Of course there is no evidence of that, further proving DiChiara's willingness to make baseless assertions even at this stage of the case. Actually, in the district court DiChiara tried to attribute malice to Colvin because the *Beckerich* lawsuits contained "personal aspersions" against him and "public protests" at his home. Those unfair attacks were some of the ugliest aspects of those cases, but the fact DiChiara tried to twist them to show malice was beyond the pale.

**VI.    Defendants were entitled to judgment on the claim for declaratory relief.**

As found by the District Court, for-cause termination triggered the non-compete provision. (Opinion, R. 72, Page ID# 3557.)  The claim is also moot because the non-compete expired.  *Choate v. Koorsen Protective Servs., Inc.*, 929 S.W.2d 184, 184 (Ky. 1996) (a decision on an expired non-compete would be meaningless).

## CONCLUSION

DiChiara was entitled to voice her medical objections to the vaccine policy, which is why two healthcare CEOs took the time in the midst of an unprecedented public health crisis to hear her out for over an hour.  However, when she was disappointed by the decision to maintain the policy, DiChiara was not entitled to violate her Employment Agreement and basic tenets of appropriate workplace conduct by disclosing their private email communications without authorization.

When misconduct of this sort is revealed, an employer is forced to evaluate whether the conduct—as illuminated by the employee's explanation for it—is statutorily protected or simply a terminable offense.  Here, it is indisputable that the representations from DiChiara and her counsel, which explained both the scope of her conduct and her motivations, defeated any notion that she had engaged in protected activity by participating in *Beckerich II* (the representation was that she had "declined" to do so) or assisting with Title VII/ADA claims (the representation was that she would "vigorously fight" attempts to have her assist with the case).

With this evidentiary backdrop, the legal issue the Court must decide is whether an employee engages in (and puts her employer on notice of) protected activity by having "thoughts" and "concerns" about legal violations but intentionally omits them from all communications with her employer.  Or, put another way: whether an employee caught in otherwise terminable conduct is entitled to misrepresent the nature of her conduct and her motivations, in order to lay a trap for statutory retaliation.  As a matter of law and common sense, that cannot be the case.

In fact, DiChiara knows it cannot be the case, hence the lengths she has gone to insert terms like "Title VII" and "ADA" into documents and recorded conversations *ex post facto*.  No matter how hard she tries to mischaracterize her own contemporaneous communications, her own counsel's emails, and the other evidence in this case, she cannot escape the fact SEP was perfectly within its contractual and legal rights to terminate her for cause.

For these reasons, the Court should affirm the summary judgment entered by the United States District Court for the Eastern District of Kentucky.

Respectfully submitted,

/s/ Mark D. Guilfoyle
Mark D. Guilfoyle (KBA #27625)
Nicholas C. Birkenhauer (KBA #91901)
Michael J. Enzweiler (KBA #96989)
DRESSMAN BENZINGER LAVELLE PSC
109 East Fourt Street
Covington, Kentucky 41011
(859) 341-1881

47

mguilfoyle@dbllaw.com
nbirkenhauer@dbllaw.com
menzweiler@dbllaw.com
*Counsel for Defendants/Appellees*

## CERTIFICATE OF COMPLIANCE

1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because it contains 12,531 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(f).

2.     This brief complies with the typeface requirement of Fed. R. App. P. 32(a)(5) and the type-style requirement of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

/s/ Mark D. Guilfoyle
Mark D. Guilfoyle (KBA #27625)

## CERTIFICATE OF SERVICE

I certify that on the 13th day of November, 2025, this Brief of Defendants-Appellees was filed with the Court's electronic filing system, which will effectuate electronic service upon all counsel of record.

/s/ Mark D. Guilfoyle
Mark D. Guilfoyle (KBA #27625)

## ADDENDUM – DESIGNATION OF REFERENCED DOCUMENTS

| Record | Description | Page ID# |
|---|---|---|
| 1 | Plaintiff's Verified Complaint | 1-19 |
| 31 | Plaintiff's Amended Verified Complaint | 405-425 |
| 43 | Order | 516 |
| 44-41 | 9/8/21 Email from Prichard to DiChiara | 991-992 |
| 44-46 | 9/13/21 Email from DiChiara's counsel | 1001-1002 |
| 44-49 | 9/15/21 Email exchange between counsel | 1009-1012 |
| 44-53 | 9/20/21 Email exchange between counsel | 1021-1023 |
| 44-68 | 8/16/21 Audio recording of meeting | N/A |
| 45 | Deposition of Defendant-Appellee, Dr. Robert Prichard | 1568-1886 |
| 46 | Deposition of Jacob Bast, SEP Corporate Representative | 1887-2136 |
| 47 | Deposition of Defendant-Appellee, Garren Colvin | 2137-2268 |
| 50 | Deposition of Plaintiff-Appellant, Dr. Amy DiChiara | 2484-2688 |
| 50-1 | Employment Agreement between SEP and DiChiara | 2689-2725 |
| 50-2 | 8/5/21 Email regarding vaccination policy | 2726-2731 |
| 50-4 | 8/7/21 Undisclosed emails between DiChiara and Deters | 2735-2736 |
| 50-6 | 8/9/21 Email from DiChiara requesting meeting | 2738 |
| 50-9 | 8/13/21 Undisclosed emails between DiChiara and Deters | 2743 |
| 50-10 | 8/16/21 Letter from DiChiara | 2745-2771 |
| 50-11 | 8/16/21 and 8/17/21 Emails from DiChiara | 2772-2773 |
| 50-12 | 8/18/21 Undisclosed emails between DiChiara and Deters | 2776-2777 |
| 50-15 | Complaint filed in *Beckerich I* | 2783-2893 |
| 50-16 | 8/26/21 Email from DiChiara to Colvin | 2894 |
| 50-18 | 8/26/21 and 8/27/21 Email exchange | 2897-2899 |
| 50-22 | 8/31/21 Undisclosed emails between DiChiara and Deters | 2913-2917 |
| 50-23 | 8/31/21 First forwarding of emails to Eric Deters | 2918-2920 |
| 50-24 | 8/31/21 Second forwarding of emails to Eric Deters | 2921-2922 |
| 50-29 | 9/1/21 Undisclosed email from DiChiara to Eric Deters | 2930 |
| 50-33 | Exhibit 3 to the Complaint filed in *Beckerich II* | 2938-2947 |
| 50-34 | 9/3/21 Undisclosed email from DiChiara to Eric Deters | 2948-2950 |
| 50-35 | Complaint filed in *Beckerich II* (without exhibits) | 2951-3043 |
| 50-36 | 9/5/21 Apology from DiChiara | 3044-3047 |
| 50-40 | 9/13/21 Religious exemption request | 3081-3083 |
| 50-41 | 9/20/21 Email granting religious exemption request | 3084-3085 |
| 50-44 | 10/4/21 Termination Letter | 3107-3108 |
| 50-45 | SEP Electronic Forms of Communication Policy | 3109-3111 |
| 50-46 | DiChiara's Confidentiality/Non-Disclosure Agreement | 3112 |

| 50-47 | SEP Associate Handbook | 3113-3134 |
|-------|------------------------|-----------|
| 52 | Defendants' Motion for Summary Judgment | 3183-3224 |
| 53 | Plaintiff's Motion for Summary Judgment | 3225-3290 |
| 55 | 10/4/21 Audio recording of termination meeting | N/A |
| 57 | Response to Plaintiff's Motion for Summary Judgment | 3305-3348 |
| 58 | Opposition to Defendants' Motion for Summary Judgment | 3349-3388 |
| 65 | Defendants' Reply in Support of Summary Judgment | 3427-3443 |
| 66 | Plaintiff's Reply in Support of Summary Judgment | 3444-3458 |
| 71 | 3/7/25 Oral argument transcript | 3465-3529 |
| 72 | Memorandum Opinion and Order | 3530-3558 |
| 73 | Judgment | 3559 |
| 74 | Notice of Appeal | 3560 |

50